IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TAMORI MORGAN,<br><br>Defendant. | Case No. 23-10047-JWB |

## MEMORANDUM AND ORDER

This matter is before the court on Defendant's motion to dismiss based on Second Amendment grounds. (Doc. 26.) A response and a reply have been filed (Docs. 28, 29), and the court held a hearing to establish additional facts about the weapons charged. The motion is thus ripe for review. The court finds that the Second Amendment applies to the weapons charged because they are "bearable arms" within the original meaning of the amendment. The court further finds that the government has failed to establish that this nation's history of gun regulation justifies the application of 18 U.S.C. § 922(o) to Defendant. The court therefore grants the motion to dismiss.

**I.   Background**

Defendant Tamori Morgan is charged with two counts of possessing a machinegun in violation of 18 U.S.C. § 922(o). (Doc. 1.) Specifically, Defendant is charged with possessing an Anderson Manufacturing, model AM-15 .300 caliber machinegun and a machinegun conversion device. It was established at the hearing that the conversion device is a so-called "Glock switch" which allows a Glock, model 33, .357 SIG caliber firearm to fire as an automatic weapon.

**II.   Standard**

Under the Second Amendment, "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *D.C. v. Heller*, 554 U.S. 570, 582 (2008). To keep arms means, simply, to possess arms. *Id.* at 583. If the plain text of the Second Amendment applies to a defendant's conduct, the government has the burden to show that the regulation is consistent with this nation's historical firearm regulation tradition. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). This standard requires a "historical analogue" between the modern regulation and historical regulations, not a "historical twin." *United States v. Rahimi*, 144 S. Ct. 1889, 1902–03 (2024).

**III.    Analysis**

Defendant argues that 18 U.S.C. § 922(o) is unconstitutional facially and as applied to him. (Doc. 26 at 1.) Defendant first argues that, under the first step of *Bruen*, the plain text of the Second Amendment applies to his conduct of possessing machineguns. (Doc. 26 at 6.) The government argues to the contrary, pointing to language in *Heller* that suggests the unconstitutionality of machinegun regulation would be "startling," and that the Second Amendment only applies to weapons that were commonly used by law-abiding citizens at the time of the Second Amendment's enactment. (Doc. 28 at 4 (citing *Heller*, 554 U.S. at 624–25).)

The Tenth Circuit has yet to apply *Bruen* to § 922(o). Therefore the court starts its analysis at the beginning: the statutory text. Section 922(o) generally makes it unlawful to "possess a machinegun." *Id.* Section 922 incorporates the definition of machinegun from 26 U.S.C. § 5845, which defines that term as

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function

> of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

§ 5845(b). The court notes that this definition is extremely broad. It does not, for instance, include a projectile in the definition like the definitions for a "rifle" or "shotgun" do under 18 U.S.C. § 921 or § 5845. Nor does it require that a projectile or "shot" be expelled through the energy of an explosive or other propellant, as contemplated under the definitions of "rifle," "shotgun," "any other weapon" and "destructive" device" in § 5854(c) through (f), or the definitions of a "firearm," "shotgun," or "rifle" in § 921(a). Thus, this definition seems to encompass everything from an aircraft-mounted automatic cannon to a small hand-held taser or stun gun that can easily be placed inside a handbag and which shoots multi-shot bursts of electrical particles with a single pull of the trigger, or a fully automatic BB gun that shoots multiple rounds of metal projectiles using compressed air. The court is not, of course, faced with a situation where the government has charged someone under § 922(o) with illegal possession of a taser or a BB gun. But the example of the aircraft-mounted gun seems fatal to Defendant's facial challenge. Plaintiff fails to show how an example like that would constitute a "bearable arm" within the Second Amendment's protection. And to succeed on a facial challenge, Plaintiff must show that § 922(o) is unconstitutional in all its applications. *Rahimi*, 144 S. Ct. at 1888. The court thus proceeds to analyze Plaintiff's as-applied challenge.

Here, Plaintiff is charged with two counts of machinegun possession, and both counts apply to arms that can be carried in the hand. Thus, by definition, the machinegun and Glock switch are

bearable arms within the plain text of the Second Amendment.[1]  The government relies on *Heller* to argue that machineguns are not covered by the plain text of that amendment.  The *Heller* language cited by the government is unavailing.  First, the government's interpretation of *Heller* relies exclusively on dicta (and circuit authority that predates the historical analysis mandated in *Bruen*)—machineguns were not at issue in *Heller*.  Second, the government's interpretation would run directly counter to the essential analysis in *Heller*: just as the Fourth Amendment applies to modern "searches," the Second Amendment applies to arms that did not exist at the country's founding.  *Heller*, 554 U.S. at 582.

Third, the government relies on comments in *Heller* regarding *United States v. Miller*, 307 U.S. 174 (1939), for the proposition that machineguns are not covered by the Second Amendment.  In *Miller*, the Supreme Court rejected a challenge to the National Firearms Act's prohibition against carrying an unregistered sawed-off shotgun across state lines.  *See id.* at 175–77, 183.  Interestingly, over half of the opinion in *Miller* was devoted to explaining how, in the years preceding and immediately following the enactment of the Second Amendment, one of the lawful purposes for which law-abiding citizens possessed modern (for that era) firearms was for service in the militia.  *Id.* at 178–82.  The Court surveyed several laws from that era that not only permitted, but essentially required, law-abiding citizens to provide for their own use modern military-style small arms.  *See id.* at 180–82.  Against that backdrop, the Court concluded that a sawed-off shotgun was not the type of weapon that would be useful for military service.  *See id.* at 178, 182–83.  In *Heller*, the Supreme Court simply observed that *Miller* fit within the tradition of regulating "dangerous and unusual weapons."  *Heller*, 554 U.S. at 627.  Moreover, it bears noting that, unlike

---

[1]  The government does not argue, nor does the court find, that the Glock switch is a mere accessory unprotected by the Second Amendment.  *Cf. United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (suppressor is an accessory unprotected by Second Amendment).  The switch is, rather, an integral component of what makes the Glock to which it is attached a machinegun.

§ 922(o), the National Firearms Act does not categorically prohibit the possession of the sawed-off shotgun at issue in *Miller* or the firearms at issue in this case; rather, that act regulates possession of such weapons by restricting possession to those who comply with the registration and taxation requirements imposed under the act. *See Miller*, 307 U.S. at 175; 26 U.S.C. § 5861. *Heller*, because it predates *Bruen*, however, certainly does not say that the Second Amendment does not apply to bearable machineguns. It merely implies that restrictions on "dangerous and unusual weapons" can be consistent with this nation's history and tradition of firearm regulation. This touches on what is now the second step of *Bruen*, rather than the first step. Suffice it to say that the weapons at issue in this case are bearable arms that, under *Bruen*'s first step, are covered by the plain text of the Second Amendment. The court thus proceeds to the second step in the analysis.

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Bruen*, 597 U.S. at 24 (quotation omitted). In *Heller*, the Supreme Court concluded that the Second Amendment "'guarantee[s] the individual right to *possess* and *carry* weapons in case of confrontation' that does not depend on service in the militia." *Bruen*, 597 U.S. at 20 (emphasis added) (quoting *Heller*, 554 U.S. at 592). It is worth noting at the outset that the Court's language distinguishes between possessing and carrying weapons, and that § 922(o) prohibits the mere act of possessing a machinegun, without regard to whether the weapon is carried or otherwise employed.

Defendant argues that the government cannot meet its burden to show that § 922(o) is consistent with this nation's history of firearm regulation. (Doc. 26 at 8–9.) To meet its burden, the government advances only two potential historical analogs. First, the government points to English common law, which it asserts prohibited riding or going armed with dangerous or usual weapons. (Doc. 28 at 7 (citing 4 William Blackstone, Commentaries on the Laws of England 148–49 (1769).) Second, the government cites one case from the North Carolina Supreme Court in 1824 that recognized an offense to arm oneself "with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." (*Id.* at 7–8 (citing *State v. Langford*, 3 Hawks 381, 383 (NC 1824).) But both examples are disanalogous to what Defendant is charged with here—simple possession of a machinegun.

As to the government's first example, the Supreme Court addressed this history in *Bruen*. There, the Supreme Court observed that Blackstone's reference to English laws concerning going armed with dangerous and unusual weapons derived from the Statute of Northampton, an English statute from 1328 which generally provided that

> Englishmen could not "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure."

*Bruen*, 597 U.S. at 40 (citation omitted). According to the Court, "[n]otwithstanding the ink the parties spill over this provision, the Statute of Northampton—at least as it was understood during the Middle Ages—has little bearing on the Second Amendment adopted in 1791." *Id.* at 41. It was focused, for the most part, on conduct that evinced an intent to breach the peace, *id.*, and, in any event, was predicated on the manner in which arms were carried or displayed. *Bruen* considered an example of the application of the Statute of Northamptom to the conduct of Sir John

Knight, who was charged with violating the statute based on allegations that he "did walk about the streets armed with guns, and that he went into the church of St. Michael, in Bristol, in the time of divine service, with a gun, to terrify the King's subjects." *Id.* at 43 (citation omitted). The Court further observed that "one's conduct 'will come within the [Statute of Northampton],'—i.e., would terrify the King's subjects—only 'where the crime shall appear to be malo animo,' with evil intent or malice." *Bruen*, 597 U.S. at 44 (internal citation omitted). And by 1716 it was observed by another learned treatise that "no wearing of Arms is within the meaning of [the Statute of Northampton], unless it be accompanied with such Circumstances as are apt to terrify the People." *Id.* at 45 (alteration in original) (citation omitted).

Turning to the government's second example, it asserts merely that "[i]n the United States, too, courts long ago acknowledged that a man commits 'an offence at common law' when he 'arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people.'" (Doc. 28 at 7 (quoting *State v. Langford*, 10 N.C. 381, 383 (1824)).) The Supreme Court addressed this category of laws at some length in both *Bruen* and *Rahimi*, describing them as prohibitions against "going armed" or "affray," the latter word being a term derived from a French word meaning "to terrify." *See Rahimi*, 144 S. Ct. at 1900–01; *Bruen*, 597 U.S. at 46. Without belaboring the point, the Court observed that these laws combined the elements of going about in a manner to terrorize the public with dangerous and unusual weapons. *See generally Rahimi*, 144 S. Ct. 1900–01; *Bruen*, 597 U.S. at 46–50.

In contrast with the aforementioned historical examples, § 922(o) says nothing about the manner in which machineguns are carried or displayed. Instead, § 922(o) criminalizes the mere possession of such weapons without regard to how the possessor uses them. If an individual purchases such a weapon and locks it away in a gun safe in his basement for twenty years without

touching it, he is just as guilty of a violation of § 922(o) as one who takes the same weapon out on the public streets and displays it in an aggressive manner. The statute requires no more than possession, and, more importantly in an as-applied challenge, the indictment in this case alleges nothing more.

Moreover, to the extent that the Second Amendment would allow weapons to be prohibited solely on the basis that they are "dangerous and unusual" or "highly unusual in society at large", *Bruen*, 597 U.S. at 47, as the government suggests, the government has not made that showing here. As Defendant points out, "[t]here are over 740,000 legally registered machineguns in the United States today." (Doc. 29 at 4 (citing Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States – Annual Statistical Update 2021.* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download).) Machineguns have been in existence for well over a century. While the federal government has regulated transfer and possession of such weapons since passage of the National Firearms Act in 1934, it did not outright prohibit possession of machineguns until passage of the Firearms Owners Protection Act in 1986. Even then, the law did not prohibit the possession of all machineguns; rather, § 922(o) merely prohibits possession of machineguns that were not lawfully possessed as of the date that prohibition went into effect in 1986. § 922(o)(2)(B). Thus, even today, it is perfectly legal for a person who has not been divested of his firearm rights under some other provision of law to acquire and possess a machinegun, so long as it was lawfully possessed by someone before the relevant date in 1986, and so long as he complies with the National Firearms Act's requirements to obtain and possess the weapon. In that sense, machineguns are not unusual. The government fails to address these facts, and thus fails to meet its burden to demonstrate that

possession of the types of weapons at issue in this case are lawfully prohibited under the Second Amendment.

To summarize, in this case, the government has not met its burden under *Bruen* and *Rahimi* to demonstrate through historical analogs that regulation of the weapons at issue in this case are consistent with the nation's history of firearms regulation. Indeed, the government has barely tried to meet that burden. And the Supreme Court has indicated that the *Bruen* analysis is not merely a suggestion. In *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), the Tenth Circuit side-stepped the *Bruen* analysis in a challenge to the prohibition against felons possessing firearms under 18 U.S.C. § 922(g)(1), concluding that *Bruen* did not abrogate the Tenth Circuit's prior decision, *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009), which upheld the constitutionality of § 922(g)(1) in the face of a Second Amendment challenge.. *Vincent*, 80 F.4th at 1202. Nevertheless, just last month the Supreme Court vacated *Vincent* and remanded for further consideration in light of *Rahimi*. *Vincent v. Garland*, No. 23-683, 2024 WL 3259668 (U.S. July 2, 2024). The court interprets that as indicating that the Supreme Court means what it says: the constitutionality of laws regulating the possession of firearms under the Second Amendment must be evaluated under the *Bruen* framework.

Importantly, this decision says little about what the government might prove in some future case. Rather, under *Bruen*'s framework for evaluating Second Amendment challenges, it is the government's burden to identify a historical analog to the restrictions challenged in this case. This the government has failed to do. The court expresses no opinion as to whether the government could, in some other case, meet its burden to show a historically analogous restriction that would justify § 922(o).

**IV.     Conclusion**

The motion to dismiss on Second Amendment grounds (Doc. 26) is GRANTED. The motion to dismiss on Commerce Clause grounds (Doc. 25) is DENIED AS MOOT.

IT IS SO ORDERED.

Dated: August 21, 2024                          /s/ John Broomes
                                                JOHN W. BROOMES
                                                UNITED STATES DISTRICT JUDGE